IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

BRIAN K. WILLIAMS,

                Plaintiff,

      vs.

COMMISSIONER OF SOCIAL
SECURITY,

                Defendant.

)
)
)
)
)
)
)
)
)

CASE NO. 3:20CV1957


MAGISTRATE JUDGE
JONATHAN D. GREENBERG


**MEMORANDUM OF OPINION AND
ORDER**

Plaintiff, Brian Williams ("Plaintiff" or "Williams"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Commissioner of Social Security ("Commissioner"), denying his application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is VACATED AND REMANDED for further proceedings consistent with this opinion.

## I. PROCEDURAL HISTORY

In June 2018, Williams filed an application for POD and DIB, alleging a disability onset date of February 18, 2015 and claiming he was disabled due to irritable bowel syndrome, depression, migraines, arthritis, "ankles," and "back."  (Transcript ("Tr.") at 233.)  The application was denied initially and upon reconsideration, and Williams requested a hearing before an administrative law judge ("ALJ").  Tr. 142.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

On September 30, 2019 an ALJ held a hearing, during which Williams, represented by counsel, and an impartial vocational expert ("VE") testified.  Tr. 61-95.  On October 29, 2019, the ALJ issued a written decision finding that Williams was not disabled.  Tr. 43-56.  The ALJ's decision became final on July 15, 2020, when the Appeals Council declined further review.  Tr. 1-3.

On September 1, 2020, Williams filed his Complaint to challenge the Commissioner's final decision.  Doc. No. 1.  The parties have completed briefing in this case.  Doc. Nos. 20, 21, 23.  Williams asserts the following assignments of error:

> (1)  The ALJ's decision failed to adequately evaluate and account for all of Plaintiff's medically severe impairments.
>
> (2)  The ALJ's residual functional capacity determination fails to adequately incorporate the medical opinions which were found persuasive.

Doc. No. 20, p. 2.

## II. EVIDENCE

### A.    Personal and Vocational Evidence

Williams was born in 1972 and was 47 years-old at the time of his administrative hearing, making him a "younger" person under social security regulations.  Tr. 55.  *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c).  He has at least a high school education and is able to communicate in English.  Tr. 55.  He has past relevant work as an automotive assembler.  Tr. 88.

### B.    Relevant Medical Evidence[2]

### 1.        Right Thumb Impairment

On October14, 2014 Williams had an orthopedic surgery consultation with Dr. Sarah Nossav at the VA Medical Center.  Tr. 355.  Williams reported a mass on his right thumb in an area where he had a prior injury during military service.  Tr. 355.  He stated that he had experienced pain in that area and

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

that in the past few months a mass had developed at the ulnar aspect of his metacarpophalangeal ("MCP") joint. Tr. 355. The mass was not tender but it restricted his range of motion. Tr. 355. Upon exam, he was unable to flex at the MCP joint more than a few degrees and could not oppose the thumb to his small finger. Tr. 355. The MCP joint was stable to varus/valgus testing, he had intact sensation and palpable pulses, and he could flex his interphalangeal joint without discomfort. Tr. 355. Dr. Nossav reviewed right hand x-rays from July 2014, which showed "remodeling of the thumb metacarpal head especially of the radial aspect probably related to remote trauma, stable," and mild osteoarthrosis at the base of the thumb metacarpal trapezium joint. Tr. 355-356. Dr. Nossav commented that it was unclear what the origin of the mass was and that arthritic changes at Williams' MCP joint were not significant. Tr. 356. She ordered an MRI of Williams' right thumb. Tr. 356.

An MRI taken in December 2014 showed "morphological changes of the MCP joint especially along the ulnar aspect of the head with osteophyte formation and joint space narrowing." Tr. 401. The osteophytes and remodeling impinged the ulnar and radial collateral ligaments and stretched them, "slightly displac[ing] the metacarpal head and sesamoids" and "slightly deflecting the path of the flexor tendon." Tr. 401.

### 2. Headaches

On November 16, 2015, Williams visited the VA Medical Center for headaches, including migraines. Tr. 469. He reported his history: he was diagnosed with migraines in 1994 while on active service and had visited the emergency room at that time for IV treatment. Tr. 470. Since then, he had continued to experience frequent headaches; on a few occasions he went to the emergency room but on most occasions he took Excedrin migraine, Tylenol and other medications. Tr. 470. In 2010 he had had a severe headache, went to the emergency room, and a CT scan revealed a brain tumor. Tr. 471. In 2013 he had surgery to remove the tumor (a benign meningioma) but he continued to experience

3

headaches on both sides of his head about 3 times a week and lasting 1 to 2 days, for which he took Excedrin or Advil.  Tr. 471.  He described his headaches as throbbing, pulsating, and associated with nausea and sensitivity to light and sound.  Tr. 471.

A brain MRI in December 2015 showed post-surgical changes from Williams' 2013 left frontoparietal craniotomy and a small area of encephalomalacia (softening or loss of brain tissue) "including involving portion of the left precentral gyrus."  Tr. 391.  There was a retention cyst in the aerated right pterygoid hamulus and "no definite evidence of intracranial neoplastic disease."  Tr. 391.

On August 28, 2018 Williams called the VA Medical Center to report that he had had a severe headache for the past week, rated his pain 10/10, and stated that was running out of Tylenol.  Tr. 516-17.  He was advised to go to the emergency room.  Tr. 516-517.

On January 15, 2019, Williams visited the VA Medical Center and expressed frustration over not yet having a definitive diagnosis related to his ongoing headaches.  Tr. 480.  He reported having headaches three times a week and they seemed to settle on the left side of his head where the tumor had been removed.  Tr. 480.  His pain was throbbing in nature, built up quickly, and he had associated nausea and light and sound sensitivity.  Tr. 480.  Medications helped.  Tr. 480.

On June 17, 2019, Williams had a vestibular evaluation for a diagnosis of vertigo and his history of chronic headaches was noted.  Tr. 661.  The evaluation detailed his reports of a constant headache to his provider the previous month.  Tr. 662.  He underwent trigger point dry needling in his head and neck area.  Tr. 663.

## C.    State Agency Reports

On August 29, 2018, Mehr Siddiqui, M.D., opined that Williams could lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for about four hours in an eight-hour workday, and sit for a total of about six hours in an eight-hour workday.  Tr. 106.  His ability to push

and/or pull was unlimited, except as shown for lift and/or carry.  Tr. 106.  He could occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds, frequently balance and crawl, occasionally stoop, and his ability to kneel and crouch was unlimited.  Tr. 107.

On February 4, 2019, Abraham Mikalav, M.D., affirmed Dr. Siddiqui's findings on reconsideration.  Tr. 121-122.

**D.     Hearing Testimony**

During the September 30, 2019 hearing, Williams testified to the following:

- He lives in a house with his teenaged son.  Tr. 67, 86.  He has a driver's license and drives on a regular basis.  Tr. 67-68

- He last worked in 2015 and was fired after working there for about 10 years because he missed too much work.  Tr. 68, 70, 86.  He would take FLMA leave for a few months, return to work, and then take more FLMA leave.  Tr. 86-87.  He missed work due to headaches, sickness, and pain from standing and moving.  Tr. 70.

- He has been in physical therapy for his neck and back impairments.  Tr. 70-72.  He has pain radiating down his legs from his low back and he has trouble standing and sitting.  Tr. 79. He gets cortisone injections in his back but they only help for about a day.  Tr. 80.  He also suffers from fatigue and irritable bowel syndrome.  Tr. 73, 76, 83-85.

- He has headaches almost daily.  Tr. 74.  His headaches last sometimes an hour, sometimes all day.  Tr. 74.  He takes Excedrin and "Tylenol 3's."  Tr. 74.  When asked if he took prescribed medication, he stated that he couldn't remember the mediation his doctor had prescribed the previous month but it had not worked and they were trying to adjust the dosage.  Tr. 74, 78.  He had had brain surgery in 2013 and had received regular treatment for his headaches since 2015, consisting of pills and needle therapy.  Tr. 75-76.

- He described his headache symptoms: he has to go in a dark, quiet room and often he feels sick.  Tr. 78.  That happens about 2-3 times a week.  Tr. 78.

- He has problems using his right hand, "Gripping and everything.  It's not as strong as it used to be."  Tr. 81.  He has problems handling small objects such as when he writes, because he "can't really use this thumb because it doesn't really move."  Tr. 82.

- He had a fasciotomy on his left arm and that problem has resolved, although he lost some sensation in that arm.  Tr. 77-78, 82, 83.

- He is able to do chores around the house, such as cleaning up the living room and washing dishes, but then he has to sit down.  Tr. 85.  He mows grass using a push mower but he can't

5

mow the front and back yard on the same day because he gets sore from the rattling and shaking.  Tr. 85-86.  It takes about 10 minutes to mow the front or back yard.  Tr. 86.

The VE testified that Williams had past work as an automotive assembler.  Tr. 88.  The ALJ then asked the VE whether a hypothetical individual with the same age, education and work experience as Williams could perform his past work or any other work if the individual had the following residual functional capacity: he could perform a full range of light work except he can occasionally climb ramps and stairs but never ladders, ropes or scaffolds; can frequently balance and crawl; can occasionally stoop; can frequently handle and finger with his left hand; and could never be exposed to unprotected heights or dangerous machinery.  Tr. 89.  The VE testified that the hypothetical individual would not be able to perform Williams' past work but could perform the following representative jobs in the economy: parking lot attendant, clerical assistant, and cafeteria assistant.  Tr. 89-90.  The ALJ asked the VE if his answer would change if the hypothetical individual was limited to standing or walking four hours a day.  Tr. 90-91.  The VE answered that the hypothetical individual could not perform the job of cafeteria assistant but could perform the following sedentary level jobs: surveillance system monitor, document preparer, and address clerk.  Tr. 92.

Williams' attorney asked the VE whether the hypothetical individuals described above could perform any of the jobs the VE listed if the individual was limited to less than frequent handling and fingering with either of his hands, and the VE stated that such a limitation would be work preclusive. Tr. 93-94.

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to

"result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).  A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Williams was insured on the earliest possible disability onset date, July 6, 2016, and remained insured through December 31, 2021, his date last insured ("DLI.").  Tr. 43.  Therefore, in order

7

to be entitled to POD and DIB, Williams must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2. The claimant has not engaged in substantial gainful activity since February 18, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease; and left forearm compartment syndrome (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: he can stand and walk 4 hours in an 8-hour workday; he can occasionally climb ramps and stairs; he can never climb ladders, ropes, or scaffolds; he can frequently balance and crawl; he can occasionally stoop; he can frequently handle and finger with his left hand; he can never be exposed to unprotected heights or dangerous machinery.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on January **, 1972 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

8

11.     The claimant has not been under a disability, as defined in the Social Security Act, from February 18, 2015, through the date of this decision (20 CFR 404.1520(g)).

Tr. 45-56.

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v.Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so

because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996)); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.Ohio July 9, 2010).

## VI. ANALYSIS

### A. The ALJ committed reversible error when he found that Williams' headaches were not a severe impairment at step two but failed to consider Williams' headaches when assessing the RFC.

Williams argues that the ALJ erred at step two when he failed to find that Williams' chronic headaches were not a severe impairment.  Doc. No. 20, p. 11.  He asserts that the error is not harmless because "the ALJ neither discussed, nor included [Williams'] diagnosis in his Step 2 analysis" and, therefore, "the entire decision is flawed."  Doc. No. 20, p. 11.  He submits that he had testified that his

10

chronic headaches were a "significant contributing cause of frequent absenteeism which resulted in the termination of employment" and that the longitudinal record supports his testimony.  Doc. No. 20, pp. 12-13; Doc. No. 23, pp. 4-5.  He contends that the ALJ did not reference or contemplate the impact of his headaches on his ability to engage in substantial gainful employment in combination with his other impairments in any portion of his decision, warranting remand.  Doc. No. 20, p. 15; Doc. No. 23, pp. 5-6.

Defendant argues that the ALJ did not err because, after finding that Williams' headaches were not severe at step two, the ALJ "continued through the sequential evaluation process to consider his non-severe migraine complaints along with his other severe and non-severe impairments."  Doc. No. 21, p. 8. Defendant maintains that the ALJ considered Williams' testimony, including that he had "only started taking headache medication recently," and relied on the state agency reviewing physicians who found Williams' headaches to be non-severe.  Doc. No. 21, p. 9.

At step two of the sequential evaluation, an ALJ must determine whether a claimant has a "severe" impairment.  *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) & 416.920(a)(4)(ii).  To determine if a claimant has a severe impairment, the ALJ must find that an impairment, or combination of impairments, significantly limits the claimant's physical or mental ability to do "basic work activities."  *See* 20 C.F.R. § 416.920(c).  "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243, n.2 (6th Cir. 2007) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)).  When an ALJ finds both severe and non-severe impairments at step two and continues with subsequent steps in the sequential evaluation process, error, if any, at step two may not warrant reversal.  *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the failure to find an impairment severe at step two is not reversible error when the ALJ continues

through the remaining steps of the evaluation and can consider non-severe impairments when assessing

an RFC); *Anthony v. Astrue*, 266 Fed. App'x 451, 457 (6th Cir. 2008); *Hedges v. Comm'r of Soc. Sec.*,

725 Fed. App'x 394, 395 (6th Cir. 2018). "After an ALJ makes a finding of severity as to even one

impairment, the ALJ 'must consider the limitations and restrictions imposed by *all* of an individual's

impairments, even those that are not 'severe.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577

(6th Cir. 2009) (emphasis in original, quoting SSR 96-8p).

When the ALJ fails to consider the claimant's non-severe impairment when assessing the RFC, a

step two error is not harmless. *See White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787-788 (6th Cir.

2009) (reversing because the ALJ did not consider the claimant's combined severe and non-severe

impairments when formulating the RFC); *Tuck v. Astrue*, 2008 WL 474411, at *8 (W.D. Ky. Feb. 19,

2008) (distinguishing *Maziarz* because "the record is not sufficiently developed [in this case] to

determine whether at the fourth and fifth steps plaintiff has been prejudiced by the ALJ's error at the

second step."); *Jamison v. Comm'r of Soc. Sec.*, 2008 WL 2795740, at *9 (S.D. Ohio July 18, 2008)

("*Maziarz* is distinguishable from the instant case because it is not clear that the ALJ considered

plaintiff's cardiac impairment at the other steps of the sequential evaluation process."); *Hart v. Comm'r

of Soc. Sec.*, 2016 WL 6997906, at *4 (W.D. Mich. Nov. 30, 2016) ("[T]he record does not reflect that

the ALJ considered the limitations and restrictions imposed by all of Plaintiff's impairments. The ALJ's

[step 2] error here, therefore, is not harmless."); *see also Ortega v. Comm'r of Soc. Sec.*, 2021 WL

2942240, at *8 (N.D. Ohio June 21, 2021) (ALJ's error at step two reversible because the ALJ failed to

evaluate a non-severe impairment when formulating the RFC).[3]

Here, the ALJ found Williams' headaches to be non-severe at step two. The ALJ wrote,

The claimant also has the nonsevere impairments of migraine headaches irritable bowel
syndrome (IBS), vertigo, anti-phospholipid disorder, chronic-obstructive pulmonary disorder

---

[3] Report and recommendation adopted, *Ortega v. Comm'r of Soc. Sec.*, 2021 WL 2941127 (N.D. Ohio July 13, 2021).

(COPD), and psychological conditions variously described as affective disorder, trauma-related disorder, and substance abuse disorder. The records show the claimant controls his nonsevere conditions with conservative treatment, including with medication for some of the conditions, and despite pulmonary issues, he continues to smoke. The records also show the claimant had periods of noncompliance with his anticoagulation medications. (1F; 4F; 5F; 6F).

Tr. 46.  Of the six conditions listed above, the ALJ does not indicate which were controlled by "conservative treatment, including with medication."  Regarding Williams' headaches, he testified that they are not controlled, as he experienced daily headaches that required him to go to a dark room 2-3 days a week and that they sometimes last all day.  Tr. 74-76 (hearing testimony); Tr. 50 (ALJ reciting Williams' testimony regarding the severity of his headaches and observing that recent medication had not helped).

The ALJ continued,

Recent imaging tests of the claimant's brain showed no evidence of acute intracranial abnormalities, and noted stable postoperative changes after the claimant's remote surgery to remove a benign left frontal parietal tumor.[20] I find that these impairments are not "severe" impairments within the meaning of the Social Security Act and regulations, because there is no evidence that these conditions have more than a minimal limitation on the claimant's ability to perform work-related activities.[]

[FN 20] 6F/127-128; 6F/13, 128.

Tr. 46.  Here again, the ALJ does not indicate what "impairments" he means when discussing Williams' brain MRI: his headaches, vertigo, and/or psychological conditions.[4]  The records cited by the ALJ show that Williams' March 2019 brain MRI was performed due to his complaints of headaches (Ex. 6F/127-128, Tr. 776-777; Ex. 6F/13, Tr. 662).  The ALJ does not explain how a recent brain MRI noting stable changes from the prior brain MRI in 2015 showing postoperative changes after surgery supports his finding that Williams' headaches are not severe.  Thus, the ALJ did not provide an explanation at step two as to why he found Williams' headaches to be a non-severe impairment.

The ALJ's failure to find Williams' headaches non-severe at step two is not reversible error so

_____

[4] Elsewhere in his decision, the ALJ commented that Williams had reported issued with his memory since his brain surgery. Tr. 53.

13

long as the ALJ continued through the remaining steps of the evaluation and considered Williams'

headaches when assessing the RFC.  *Maziarz*, 837 F.2d at 244.  But the balance of the ALJ's decision

shows that he did not consider Williams' headaches when assessing the RFC.

> For instance, the ALJ recited Williams' testimony regarding his headaches:
>
> The claimant said he was fired from Kuka because he took too many days after he ran out of FMLA leave, and he was having headaches, sickness, and pain. He said he had a TENS unit, and physical therapy multiple times for his back pain. (However, he said he did not treat with physical therapy after February of 2015. The claimant said things went downhill after he had brain surgery in 2013, and now his memory "is not right." The claimant said he is unable to work because of his back pain, daily headaches, and he gets tired easily. He feels like his back pain causes fatigue. He feels sick every morning because of irritable bowel syndrome, and he has daily headaches for which he takes Excedrin, Tylenol, and Tylenol 3. He spends time in a dark room when he has headaches, he needs to be in a dark room 2-3 times a week, and the headache episode can last all day. According to his testimony, the claimant was only recently started on headache medication at the VA, but it is not helping. [sic]

Tr. 50.  The ALJ found Williams' testimony regarding his symptoms to be not consistent with the

evidence in the record but did not explain why.  Furthermore, the ALJ's summary of Williams'

testimony regarding his headache medication is not supported by the hearing transcript:

> Q [ALJ]:  And what do you take for your headaches?
> A: [Williams]:  Excedrin, Tylenol. Tylenol 3's. Me and my doctor just—
> Q:      You don't have any prescribed medication?
> A:      That's the one I was trying to remember the name of that the doctor had me on the last month and I told him that it wasn't really effective and—
> Q:      When did your headaches start?
> A:      My headaches been, I've been having headaches since about '96
> Q:      Since you started this claim, which, you started the claim in June of 2018 but you alleged an onset date of February of 2015.  During that period of time, since 2015, were you getting treatment for headaches?
> A:      No.  I just had brain surgery.
> Q:      When did you have brain surgery?
> A:      In, oh, —
>         (Pause.)
>         I want to say February of '13.
> Q:      I'm sorry? Did you say February of '13?
> A:      My brain, my memory is, ever since that brain surgery my memory and, it's just not been right.  I think it was '13.
> Q:      Okay. But since you left Kuka have you gotten treatment for your headaches?
> A:      Just the regular, you know, pills and the therapy they gave me a couple months ago.

14

          That's what they was trying as far as—

Q:     Have you had prescribed medication for your headaches from, since when?

A:     It's been three months, and after the first month I told him that the medication wasn't working and he upped the amount.  And we just trying that now.

Q:     So you were not getting treatment for your headaches up until three months ago?

A:     No, I have.  It's just they been changing.  Like they—

Q:     Let me ask you this again.  Since you left Kuka, did you seek treatment for your headaches?

A:     Yes.

Q:     Okay, when did you start seeking treatment for your headaches?

A:     I've been continuously—

Q:     But they didn't prescribe anything until three months ago?

A:     No, they've been prescribing the Tylenol first, then they went to Tylenol 3's, then they went to Tylenol with the caffeine in them.  Then they tried the therapy with it.

Q:     What kind of therapy?

A:     Needling.  And this new one I the new medicine, I think its call Rini—it's a prescribed medicine.

Q:     When did they do the needle therapy?

A:     About three months ago.

Tr. 74-76.

The ALJ's statement that Williams testified on September 30, 2019 that he had "only recently started on headache medication" is incorrect.  Williams testified that he had been on medication; he had recently started taking a new medication.  Treatment notes cited by Williams support his testimony.  The record shows that he had been taking prescribed headache medicine in August 2018 when he called the VA Medical Center to report a severe headache for the past week and was advised to go to the emergency room.  Tr. 520; see also Tr. 480 (Williams' January 2019 visit to the VA Medical Center complaining of headaches and reporting that Imitrex had not helped).  Elsewhere in his decision, the ALJ acknowledged that Williams had a prescription for Tylenol 3 with codeine in 2019.  Tr. 52 (citing Exhibit 6F/18 (Tr. 667), indicating prescriptions in July/December 2018 and April and May 2019).  Thus, the ALJ misconstrued the evidence regarding Williams' headache medication.

The ALJ also failed to appreciate that Williams had trigger point dry needling therapy to treat his headaches, consistent with his testimony.  In his decision, the ALJ acknowledged that Williams had

15

trigger point dry needling therapy by a physical therapist in 2019 but described that it was "to address his neck and back pain." Tr. 51 (citing Exhibit 6F/14, Tr. 663).  But the treatment note from that visit in June 2019 shows that the focus of the trigger point dry needling therapy was Williams' diagnosis of vertigo and his complaints of chronic headaches.  Tr. 661.  His cervical spine x-ray and brain MRI results were reviewed.  Tr. 661-662.  He described dizziness, pain in the left side of his neck that traveled up to his head, and having a constant headache.  Tr. 662.  He was sensitive to light.  Tr. 662. His head pain started behind his left ear and moved to the top of his head and behind his eyes as it increased.  Tr. 662.  He took his headache medication 4-5 times a week.  Tr. 662.  The therapist used dry needle therapy in the trigger points in his bilateral cervical spine, bilateral occiput, and left upper trapezius and levator area.  Tr. 663.  The ALJ's characterization of that therapy as treatment for his "neck and back pain" is inaccurate.

The ALJ also cited a treatment note which he described as showing that Williams went to an urgent care center complaining of "neck pain" and followed up at the VA.  Tr. 52 (citing Exhibit 6F/40, Tr. 689).  But the ALJ's characterization of that treatment note is incomplete.  The note shows that Williams called the VA on May 13, 2019 to report that he had experience neck pain and a headache for the last couple of weeks.  Tr. 689.  He had gone to an urgent care the week before, he was given prednisone and Tylenol 3, the pain had gotten better, but now it was returning.  Tr. 689.  He described neck pain running up into his head.  Tr. 689.

In sum, the evidence shows that Williams regularly complained of chronic severe headaches, he had been prescribed medication for those headaches, and he had therapy to treat them.  That evidence supports Williams' testimony.  Because the ALJ misconstrued Williams' testimony regarding his treatment, discounted Williams' testimony regarding his headaches without discussion, and did not consider the evidence cited above that is consistent with that testimony, the ALJ's decision is not

supported by substantial evidence.  *White*, 312 F. App'x 779, 787-788 (reversing and finding that the ALJ's step two determination that the claimant's mental impairment was not severe "is not supported by substantial evidence, because the ALJ mischaracterizes the evidence and misstates Dr. Basch's reasons for prescribing anti-depressants….Because the ALJ does not accurately state the evidence used to support his finding, his total discounting of the mental impairment is not supported by substantial evidence.").  Therefore, the ALJ's error at step two is not harmless, and the Commissioner's decision must be reversed.  *Hart*, 2016 WL 6997906, at *4, 8 (reversing the Commissioner's decision because "the record does not reflect that the ALJ considered the limitations and restrictions imposed by all of Plaintiff's impairments.  The ALJ's [step two] error here, therefore, is not harmless.").

**B. On remand, the ALJ will have an opportunity to reconsider Williams' right thumb impairment and the opinion of consultative examiner Dr. Lakin.**

Williams also makes a step two argument with respect to his diagnosis of post-traumatic arthritis of his right thumb.  Doc. No. 20, p. 11.  And he argues that the ALJ erred when he found Dr. Lakin's opinion that Williams could occasionally stand and walk to be persuasive but failed to account for that limitation in his RFC.  Doc. No. 20, p. 15.  On remand, the ALJ will have an opportunity to reconsider Williams' right thumb impairment and Dr. Lakin's assessed limitations.

17

## VII. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED AND

REMANDED for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Date: September 23, 2021                                  _s/ Jonathan Greenberg_
                                                         Jonathan D. Greenberg
                                                         United States Magistrate Judge